EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES et al., Appellants,

v.

Henry Lee FRY et al., Appellees.

No. 24290.

United States Court of Appeals Fifth Circuit.

Nov. 28, 1967.

Rehearing Denied Dec. 28, 1967.

**240**

Ronald L. Reid, Atlanta, Ga., Alston, Miller & Gaines, Atlanta, Ga., of counsel, for appellants Equitable Life Assur. Soc. of United States, and Lumbermens Mut. Casualty Co.

Sam F. Lowe, Jr., Atlanta, Ga., Smith, Cohen, Ringel, Kohler, Martin & Lowe, Atlanta, Ga., of counsel, for appellant Metropolitan Life Ins. Co.

Nolan B. Harmon, G. William Thackston, Jr., Archer D. Smith, III, Atlanta, Ga., Harmon & Thackston, Atlanta, Ga., for appellees Henry Lee Fry and Citizens and Southern Nat. Bank, as coexec-

utors under will of Elmer Lee Fry, deceased.

Buckner F. Melton, Macon, Ga., Melton, McKenna & House, Macon, Ga., of counsel, for Mary Elizabeth Fry, Martha Regina Fry and David Lee Fry, by and through Mrs. Anne Fry Malone, as next friend, plaintiffs-intervenors, appellees.

Before TUTTLE, GEWIN and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

In this diversity matter four separate actions alleging breach of contracts of insurance were consolidated for trial before a jury and resulted in a verdict for plaintiffs. Suits were brought by the co-executors of the estate of the deceased insured, Dr. Elmer Lee Fry, to enforce payment of accidental death benefits alleged to be due under the provisions of insurance policies issued to the deceased, plus statutory penalties and attorneys' fees. Deceased's estate is the beneficiary under the policies. Defendants-appellants are the insurers of the deceased under either accidental death policies or life insurance policies with double indemnity provisions in the event of accidental death.[1] Motions for directed verdicts were denied. Judgments were then rendered in the amounts of the accidental death benefits provided for in the policies.[2] Defendant insurance companies have appealed from the judgments of the district court entered upon the jury's verdict, and from the order denying motions for judgments notwithstanding the verdict and alternatively for a new trial.

The question for decision (as stated in appellants' specifications of errors) is whether the evidence was sufficient to justify the denial by the lower court of defendants' motions for directed verdicts and for judgments notwithstanding the verdicts.

Appellees maintain in their brief that "the primary cause of Dr. Fry's death was a blow to his head caused by a fall resulting in loss of consciousness and, *in the position in which the body found itself,* the airway was blocked and death ensued from asphyxia" and the accidental means which directly brought death was thus the position of Dr. Fry's body.

Appellants contend that there was no evidence from which the jury could have lawfully found that the deceased died an accidental death within the meaning of the accidental death provisions of the policies of insurance; that in arriving at a verdict the jury necessarily indulged in speculation and pyramiding of inferences as there was no proof of an accidental fall or that asphyxia was accidental; and

1. The following seven policies of insurance were the subject of these actions:
*Metropolitan Life Insurance Company*— Four life insurance policies in the total face amount of $87,000, with provisions for the payment of an additional like amount for death of the insured "as the result, directly and independently of all other causes, of bodily injuries caused solely by external, violent and accidental means, and that such death shall have not occurred * * * as the result of or by contribution of disease or bodily * * * infirmity * * *." One accidental death policy providing for payment of a $30,000 death benefit, "If, while this policy is in force, the insured sustains accidental bodily injuries, which directly and independently of all other causes, result in * * * loss of the life of the insured, * * *."
*Equitable Life Assurance Society*—One life insurance policy in the face amount of $29,000, with provisions for the payment of an additional like amount if the death of the insured "resulted directly and independently of all other causes from *accidental bodily injury*" and further that "disease or illness of any kind, physical or mental infirmity, * * * did not directly or indirectly cause or contribute to such death. * * *"
*Lumbermens Mutual Casualty Company* —One "Specific Loss Indemnity" policy providing for payment of $50,000, "When bodily injury caused solely by an accident * * * shall, directly and independently of all other causes, result in * * * Loss of Life."

2. The record does not contain interrogatories to the jury or the court's charge. However, it is evident from the judgments that no awards were made for punitive damages or attorneys' fees.

that the entirely circumstantial evidence proposed to support appellees' theory gives equal or greater support to collapse brought about by a diseased liver.

On October 23, 1961, at approximately 9:00 a. m., Dr. Elmer Lee Fry, a forty-year-old anesthesiologist, was found dead in his apartment in Atlanta, Georgia. He was separated from his wife and living alone at the time. His body, clad in pajamas, was discovered by members of the Atlanta Police Department who had responded to a call made by Dr. Lester Rumble, Jr., an associate, requesting that a check of the apartment be made because of the unexplained absence of Dr. Fry from St. Joseph's Hospital where he was scheduled for duty that day following a two-week vacation. The police officers found the door of the apartment locked, but by use of a passkey and removal of a screw of the inside safety chain, they were able to enter. Dr. Fry's body was lying in a prone position on the carpeted floor in the doorway between the living room and bedroom. His face was turned slightly to the right. There was a discoloration on his left cheek. The oral and nasal cavities contained small amounts of dark brown mucinous material as did the carpet beneath his head. The carpet was ruffled beneath his neck and shoulders. There was no evidence of external violence, homicide or suicide. Shortly thereafter, Dr. Rumble arrived at the apartment and pronounced Dr. Fry dead. Dr. Rumble, alone, noticed a mark on decedent's right temple. Photographs were taken by the police photographer of the body in the position in which it was discovered and after it was turned over. The body was removed to the Fulton County Morgue where an autopsy was made by Dr. Tom Dillon, Fulton County Medical Examiner.

Parts of the body were sent to the Georgia State Crime Laboratory for examination and report, resulting in complete negative findings of the presence of heavy metals, organic poisons, including volatiles, alcohol, cyanide, barbiturates and narcotics.

A number of medical experts testified for both plaintiffs and defendants. Dr. Rumble, as anesthesiologist, and plaintiff witness, testified that he had known Dr. Fry for approximately twenty years and for three years on a daily basis. When asked whether Dr. Fry had ever missed any time from work because of hangover or intoxication, the witness replied that Dr. Fry was not absent from duty at any time nor did he ever leave early because of illness or any other cause. He characterized Dr. Fry's drinking habits as merely social. He observed that the feet of decedent were hyperextended, tending to make a straight line with his legs. His arms were under his body, which Dr. Rumble considered an unusual position. It was his impression when looking at the body that the discoloration on Dr. Fry's left cheek was bloody mucous. He found as significant a linear mark on the right temple area around the eyebrow, which appeared to be a bruise. He could not tell when or in what manner this mark had been made. The position of the teeth and lower lip indicated pressure exerted from a fall. It was Dr. Rumble's opinion that decedent "very definitely" died of asphyxia or suffocation. He said that the most common form of airway obstruction in an unconscious person is the falling back of the tongue against the posterial wall of the throat. Whenever it is necessary to anesthetize a patient for surgery to be performed in a prone position, a tube is put into the windpipe of the patient so that there is no possibility of airway obstruction. Dr. Rumble concluded that the position in which decedent's body was found "leaves no question about the probability of airway obstruction, if not the certainty, and he was dead, and nobody yet has turned up any other reason why he should have died at that particular point of time in that particular position. So that knowing what asphyxia can do and having, unfortunately, witnessed its effects on too many occasions, this just presents to me a clear cut picture of asphyxial death." The position of decedent's hands and feet was typical of lack of oxygen and convulsion. Dr.

Rumble said that the mark on decedent's right temple was an indication of a blow which could have been caused by a fall and the blow could have produced unconsciousness. The position of decedent's body "with the arms underneath, with its face crammed down into the carpet so that it would have been terrifically difficult, if not impossible, for him to breathe, and with the very obvious change in color and with the classic signs of convulsions having occurred at some point" convinced Dr. Rumble that this was an asphyxial death. The witness said that trauma very definitely can cause unconsciousness with no demonstrable derangement in the brain and that the only way decedent's unconsciousness could be explained was that it was caused by trauma, in the face of the negative toxicological findings in the autopsy report.

Dr. John Edward Steinhaus, Chief of the Department of Anesthesiology at Grady Memorial Hospital, Atlanta, Georgia, testified for plaintiffs that he knew decedent professionally. From an examination of the photographs in evidence, it was his opinion that the discoloration on the left cheek of the decedent was a bruise which he believed was sufficient to cause possible loss of consciousness. After Dr. Fry's death, Dr. Steinhaus examined the discolorations on the rug in the apartment and it was his opinion they were caused by blood or some combination of body fluids and blood. Dr. Steinhaus testified that in his opinion death was caused by asphyxia resulting from an obstructed airway and the position in which decedent's body was found; that the position of the body indicated a fall. The discoloration on the left cheek could have been caused by trauma.

Dr. John Adriani, head of the Department of Anesthesia at Charity Hospital, New Orleans, Louisiana, another plaintiff witness, testified that it was his opinion that decedent had fallen, and considering the negative findings of the autopsy and the toxicological examinations, he "would suspect that this was an asphyxial death"; that decedent "fell, had no control of himself, the way his arm is placed under his chest, and was unable to control himself just as a patient would be if he were drugged or unconscious from other cause, and that in that position, in the head down position like that, obstruction occurs very easily and asphyxia could very well have caused the death of this individual, with the negative autopsy findings." He was of the opinion that a blow or an external force caused the bruise on decedent's left cheek. However, the bruise was not necessarily connected with the body being on the floor. It is possible for a person who has died of asphyxia to have a clear airway in an autopsy. He said that a prone position is the most dangerous position from the standpoint of asphyxia, and when surgical procedure requires that a patient be placed in this position, an intratracheal tube is inserted into the windpipe to avert asphyxia.

Dr. Tom Dillon, Fulton County Medical Examiner, called by defendants, testified that he performed an autopsy on the body. The nose and mouth of decedent contained a small amount of red-brown mucous. It is not unusual to find such material after a person has died; it is a body fluid which drains at the moment of death or a few minutes prior to death. The body was in a state of complete rigor mortis. The only mark that he saw on the body was the discoloration on the left cheek. In his opinion the mark was a "pressure mark that is seen in skin that is compressed for a prolonged period between a bone and a relatively firm surface. * * * " This was the only mark on the body. He did not consider it to be a bruise because of its color, its leathery consistency, and absence of swelling and because there was no evidence of injury. He further described the mark as showing a pattern which resembled the coarse weave of the fabric on which the body had rested. In his autopsy report he found no evidence of intracranial hemorrhage. He examined the body with a hand lens and

found no external evidence of disease or injuries. The cheekbone was not broken and there was no damage to the inside of the lip. No X-rays were made of the body. Dr. Fry appeared to have been dead since the afternoon of the previous day. At the time of the autopsy, because of the forward position of the tip of decedent's tongue, it did not occur to Dr. Dillon to consider whether the tongue was occluding the upper airway. There was nothing to so indicate. It was his opinion that there was no such occlusion. He based his opinion on the examination he had conducted of the body, in which he found no occlusion of the airway, which was wide open. There was no abnormality as to position and no disease. He examined various organs of decedent's body including the liver and found no visual evidence of injury or disease. Dr. Dillon viewed slides of tissue sections from decedent's body which revealed the liver was full of fat. He did not, however, consider this remarkable. He has seen many livers which have more fat. Cause of death, in Dr. Dillon's opinion, was unknown. He was of the affirmative opinion that neither asphyxiation nor trauma was the cause of death. He testified that in his experience he has been unable to determine cause of death in about perhaps slightly less than one percent of the total number of cases.

Dr. John T. Godwin, Director of Laboratories at St. Joseph's Infirmary, Atlanta, Georgia, specialist in pathology and nuclear medicine, at the request of one of the defendants, made a study of the death of Dr. Fry from medical and photographic data in evidence submitted to him. He said that it appeared that the most logical explanation of the cause of death could be based on anatomical findings which were found in the liver, that is, fatty metamorphosis which he thought was related to the ingestion of ethanol, and the detrimental effects of this agent, that is, a combination of the effects of alcohol on the liver and the heart. He found from the slide an accumulation of abnormal amounts of fat in decedent's liver, and said

that one of the primary causes for this alteration is the imbibing of alcohol, although it can be due to many other causes. The presence or absence of alcohol in the blood at the time of death is not determinative as to cause of death from alcoholism. The fatty condition of decedent's liver was not absolutely diagnostic of alcoholism for such a condition could result from poisoning, dietary deficiency, inadequate vitamins, or toxins of various types. He was of the opinion that the primary cause of Dr. Fry's death was not asphyxia resulting from unconsciousness produced by a blow to the head from a fall. He considered the mark on the left cheek to be a bruise coming from an outside effect on the body, an impact of the face against some object.

Dr. Milton Helpern, Chief Medical Examiner of the City of New York, at the request of one of the defendants, studied the death of Dr. Fry from medical and photographic data submitted to him. He was of the opinion that death was not caused by traumatic injury and that there was a reasonable possibility that death occurred from chronic alcoholism in view of the negative findings in the autopsy report and the indication from the liver slides that decedent was an alcoholic. The liver condition of decedent represented long indulgence in alcohol. Chronic alcoholics can die with convulsions or in a manner similar to persons with coronary disease. The fatty condition of decedent's liver is one which precedes cirrhosis. While asphyxiation may have been an element in this case, it did not result from a traumatic injury. Bruises are commonly encountered in people who die suddenly from natural disease where they are not in a position to protect themselves in falling. He considered the mark on decedent's face quite superficial.

Dr. Charles P. Larson, specialist in forensic pathology, of Tacoma, Washington, also a plaintiff expert witness, was questioned as to his opinion of the cause of death based on a study of the photographic evidence, the autopsy report, and

photomicrographs of blood and liver smears. In his opinion, decedent fell, and prior to falling or due to falling sustained an injury to his left cheek evidenced by what he considered to be a bruise which he thought could well be sufficient to produce unconsciousness. He said that the immediate cause of death was postural asphyxia. He did not think it possible for an autopsy, performed after a body was moved, to show whether or not during life an airway obstruction had occurred. A study of the slides of decedent's liver did not indicate the usual type of organ associated with sudden, unexplainable deaths in alcoholics. Decedent's liver was smaller and less fatty than the livers which he had seen in chronic alcoholics who had suffered sudden death and it was not diagnostic of chronic alcoholism. Dr. Larson said that in most instances the fatty condition of a person's liver similar to that of decedent's was indicative of a dietary deficiency, which could cause sudden death. In the great majority of cases where unconsciousness results from a blow, there is nothing indicative that a pathologist could see inside the brain or head.

[1–3] This Court has repeatedly held that the test to be applied in diversity cases to determine the sufficiency of the evidence for submission of a case to a jury is a matter of federal law. Planters Manufacturing Co. v. Protection Mut. Ins. Co., 5 Cir., 1967, 380 F.2d 869; Prudential Insurance Company of America v. Schreffler, 5 Cir., 1967, 376 F.2d 397; Revlon, Inc. v. Buchanan, 5 Cir., 1959, 271 F.2d 795, 81 A.L.R.2d 222. The scope of our review in cases of this kind has been summarized recently on behalf of the Court in Helene Curtis Industries, Inc. v. Pruitt, 5 Cir., 1967, 385 F.2d 841, as follows:

"The test employed by the Fifth Circuit is that a fact issue must be submitted to the jury if reasonable men could differ on the conclusions to be reached from the evidence presented. Isaacs v. American Petrofina, 5th Cir. 1966, 368 F.2d 193; Wells v. Warren, 5th Cir. 1964, 328 F.2d 666. We must view the evidence and all reasonable inferences most favorably to the party against whom the motion is made. Moreover, only the evidence and the reasonable inferences which support Appellee's theory may be considered. Wilkerson v. McCarthy, 1949, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497; Berry v. United States, 1941, 312 U.S. 450, 61 S.Ct. 637, 85 L.Ed. 945. Indeed, after Planters our sole function is to ascertain if there is a *rational basis in the record* for the jury's verdict." [3]

Our appellate function, therefore, is to determine under the facts of this case what possible evidence or inferences the jury might have considered in arriving at a verdict for appellees. We must then conclude whether such evidence or inferences form a rational or reasonable basis for the findings by the jury.

In Liberty Mutual Insurance Co., et al. v. Falgoust, et al., 5 Cir., 1967, 386 F.2d 248, we analyzed the recent Fifth Circuit cases pertaining to the determination of the sufficiency of the evidence to present a question for the jury and which test whether the evidence is sufficient to support the jury's verdict, in the following review:

"We have said that if there is no evidentiary basis for the jury's verdict, it cannot be permitted to stand, and that the standard for reviewing a jury verdict is whether the state of the proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict. The jury is, of course, the traditional finder of the facts, and its verdict must stand unless appellant can show that there is no substantial evidence to support it, considering the evidence in the light most favorable to appellees, and clothing it with all reasonable

---

3. See also Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

inferences to be deduced therefrom. It is not the function of the appellate court, however, to weigh conflicting evidence, judge the credibility of witnesses and arrive at a conclusion opposite from the one reached by the jury, where there is a reasonable basis in the record for the jury's verdict. The scope of appellate review of a judgment entered on a jury's verdict is limited but the Court owes a duty not as a mere automaton, but as a judicial function to determine whether there is really a rational basis for a jury's verdict. In the review of a jury verdict the inquiry, therefore, of a reviewing court is whether the jury finding could, with reason, be made upon the evidence before it, and so where a jury has tried a matter upon correct instructions, the only inquiry is whether such conclusion could, with reason, be reached on the evidence. Jury findings on conflicting evidence are binding on the Court, which accepts as true that version of the testimony the jury might reasonably have adopted in reaching its verdict, and unless there was no evidence which, if believed, would authorize the jury's conclusions, they must stand." [4]

The evidence was susceptible of various conclusions. The record does not disclose the jury's rationale in reaching its verdict but it is apparent that it believed the hypothesis of appellees as a basis therefor, namely, that decedent suffered a fall causing him to sustain either a blow to the cheek or the right temple which injury resulted in unconsciousness. The accidental position of decedent while unconscious caused him to asphyxiate and asphyxiation was the proximate cause of death. Drs. Rumble,

Steinhaus, Adriana and Larson were of the opinion that decedent suffered a fall. Dr. Rumble considered the blow to decedent's right temple to have been produced by trauma, possibly a fall. Dr. Steinhaus was of the opinion that the bruise on the left cheek was caused by trauma. Dr. Godwin considered the bruise to have been caused by impact of the face against an object. Dr. Larson reasoned that the injury to the cheek was sustained prior to or due to falling. Dr. Rumble was of the opinion that the blow to the right temple was sufficient to produce unconsciousness; Drs. Steinhaus and Larson came to the same conclusion regarding the bruise on the left cheek. Drs. Rumble, Steinhaus and Adriani attributed asphyxia to the position of decedent while unconscious. Dr. Rumble was of the opinion that asphyxiation caused death. Dr. Adriani "suspected" an asphyxial death. Dr. Steinhaus considered asphyxia as a contributing factor to death. Dr. Godwin stated that asphyxia could have caused death if the airway had in fact been occluded prior to death although it was his opinion that death was not the result of asphyxia. Dr. Larson considered asphyxia to be the immediate cause of death. In view of this testimony it is not unrealistic to conclude that such evidence and inferences supplied a reasonable basis for the jury verdict.

■ Appellants contend that only under the following hypothesis could the jury legally resolve the dispute in favor of appellees:

1. That Fry suffered a fall.

2. The fall was accidental.

3. The accidental fall caused a blow to Fry's head.

---

4. Citing the following cases in support of the text: Blount Brothers Corp. v. Reliance Insurance Co., 5 Cir., 1967, 370 F. 2d 733, 739; Prudential Insurance Company of America v. Schreffler, 5 Cir., 1967, 376 F.2d 397, 399; Dobson v. Masonite Corporation, 5 Cir., 1966, 359 F. 2d 921, 923; Gulf Oil Corporation v. Griffith, 5 Cir., 1964, 330 F.2d 729, 731; Bankers Life & Casualty Company v. Goodall, 5 Cir., 1966, 368 F.2d 918, 921; United States v. Simmons, 5 Cir., 1965, 346 F.2d 213, 218; Spach v. Monarch Insurance Company of Ohio, 5 Cir., 1962, 309 F.2d 949, 950; Patterson v. Belcher, 5 Cir., 1962, 302 F.2d 289, 297; Hanover Fire Insurance Company v. Sides, 5 Cir., 1963, 320 F.2d 437, 442; Dobson v. Masonite Corporation, supra.

4. The blow caused unconsciousness.

5. In the position in which Fry's body found itself, the airway was blocked.

6. Death ensued from asphyxia.

They argue that there is a complete absence of evidence of an accidental fall; that, therefore, the first premise and consequently the conclusion must fall. Appellee's reply to this argument is that their theory is not contingent upon an *accidental* fall and that the accidental means which brought about death was the dangerous position of the body. They argue that had decedent assumed another position, or had he not been alone and without assistance from another in changing his position, death would not have ensued. Appellees contend that having produced proof of the accidental position of decedent, they were not required to prove an accidental fall; that it was thereafter incumbent upon appellants to rebut by proof of illness or disease the accidental means of death, and that appellants failed to do so. We see no reason to dispute appellees' theory. In a suit such as this for recovery for accidental death benefits under an insurance policy, plaintiff must prove death according to the requirements of the policy. The burden then is upon defendant to show that death did not come under the policy coverage but fell under one of the exclusions of the policy. Cook v. Life Insurance Company of Georgia, 111 Ga.App. 277, 141 S.E.2d 607 (1965); Darby v. Interstate Life & Accident Insurance Co., 107 Ga.App. 409, 130 S.E. 2d 360 (1963); McCarty v. National Life & Accident Insurance Co., 107 Ga. App. 178, 129 S.E.2d 408 (1962); New York Life Ins. Co. v. Jennings, 61 Ga. App. 557, 6 S.E.2d 431 (1939).

 If illness or disease caused decedent's body to assume the hazardous position which allegedly caused asphyxiation, recovery of course would not be possible under the exclusion clauses of the policies. Cook v. Life Insurance Company of Georgia, supra; Overstreet v. Metropolitan Life Ins. Co.,

69 Ga.App. 459, 26 S.E.2d 115 (1943); Halligan v. Underwriters at Lloyd's London, 102 Ga.App. 905, 118 S.E. 2d 107 (1960). Appellants, while admitting that they do not categorically assert that decedent died the natural death of an alcoholic, call attention to the evidence indicative of chronic alcoholism. Drs. Godwin and Helpern testified to the fatty condition of decedent's liver, that this condition is associated with chronic alcoholism, and that chronic alcoholism could and, in their opinion, did cause sudden death. It was within the jury's province to conclude, as they apparently did, that the evidence relied upon by appellants was insufficient to sustain their burden of proof that death resulted from illness or disease. Dr. Godwin, while attributing decedent's death to chronic alcoholism, conceded that although a fatty condition of the liver is primarily caused by imbibing alcohol, such a condition can be due to many other causes. There was no other evidence tending to show that decedent was an alcoholic and Dr. Rumble denied that he was.

[8] While a finding by the jury that decedent's death was caused solely and proximately by the hazardous position of the body, excluding illness or disease as contributory factors, may have required some degree of speculation and conjecture, it would be a usurpation of the jury's prerogative to hold that a verdict based thereon cannot stand. In Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946), the Court, in commenting on the relatively strong evidence in favor of respondents as against that of petitioners, said:

*"It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of*

probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." (Emphasis supplied.)

 We cannot agree with appellants' conclusion that inasmuch as all of appellees' evidence as to the cause of death was circumstantial and gave equal support to theories (such as general collapse resulting from a diseased liver as a cause of decedent's fall) under which appellees could not recover, appellees did not carry their burden of proof. In Planters Manufacturing Co. v. Protection Mut. Ins. Co., 5 Cir., 1967, 380 F.2d 869, we said, in interpreting Lavender v. Kurn, supra:

"As we read *Lavender*, it is immaterial that evidence may equally support an inconsistent inference, if in fact fair-minded men might draw from that evidence the inference sought by the party against whom a peremptory instruction is sought. In such a case, it is the quintessential function of the jury to 'settle the dispute by choosing what seems to them to be the most reasonable inference.' * * * it is no answer * * * to say that a conflicting inference might with equal probability have been drawn therefrom."

In passing on the correctness of the order of the district court which denied motions for directed verdicts and judgments notwithstanding the verdicts, we need consider only the evidence or reasonable inferences which support appellees' theory of the case. Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497 (1949); Helene Curtis Industries, Inc. v. Pruitt, 5 Cir., 1967, 385 F. 2d 841.

Affirmed.