DUN & BRADSTREET, INC., Appellant,

v.

John A. MILLER, d/b/a Miller & Company, Appellee.

No. 24933.

United States Court of Appeals Fifth Circuit.

July 1, 1968.

W. Colquitt Carter, Melburne D. Mc-Lendon, Bryan, Carter, Ansley & Smith, Atlanta, Ga., for appellant.

Grady E. Rozar, Atlanta, Ga., for appellee.

Before JOHN R. BROWN, Chief Judge, AINSWORTH and GODBOLD, Circuit Judges.

AINSWORTH, Circuit Judge:

In this diversity libel action, defendant Dun & Bradstreet appeals from an adverse money judgment of $25,000 ($10,-000 general damages and $15,000 punitive damages) entered on a jury verdict for plaintiff. We reverse on the ground that it was error for the District Court to deny defendant's motions for a directed verdict and for judgment notwithstanding the verdict.

Appellee John A. Miller is engaged as a sales agent and manufacturers' agent in the business of buying, selling, and

trading new and used machinery and parts for heavy construction and allied fields under the trade name of Miller & Company. Appellant Dun & Bradstreet operates a mercantile agency which prepares and furnishes to members and subscribers, upon request, financial and credit reports on various individuals and organizations. This cause of action arose as the result of an allegedly libelous written report on Miller & Company, prepared by Dun & Bradstreet, and sent by it to Plattsburg Foundry & Machine Company, a subscriber.[1]

1. The report reads as follows:

Rating
"Dun & Bradstreet Report     Unchanged
"DO NOT CONFUSE WITH THE MILLER COMPANY,
1145 PEACHTREE ST., ATLANTA, GA.
CD 69 FEB 1 1965 N

1959    NQ

"MILLER & COMPANY
  MILLER, JOHN A., OWNER
BUS: 3121 MAPLE DR NE
RES: 799 LONGWOOD DR NW; FMLY: 555 NORTHSIDE DR NW
ATLANTA GA

"John A. Miller, born in New Orleans, Louisiana, 1911, married. Repeated and continued efforts to verify information submitted concerning subject's background have been largely unsuccessful. Miller has stated that he attended high school at Tulane University, New Orleans for one quarter, taking courses in naval architecture and marine engineering. During early manhood worked at New Orleans for his sister, Mrs. Alberta Young, owner of A. M. Young Engineering Company. Later, 1942, according to City Directories there he was employed for a short time by the U. S. War Production Board, prior to entering the Army in 1942. Is reportedly to have left the service in 1945 and, in so far as is known, has apparently spent most of the years since that time in the sales field, locating in Atlanta about 1949. He represented one or two companies in this capacity covering the Southeastern territory. Then traveled this area for a number of business in the machinery field, although these associations have been reported to have been of short duration. John A. Miller started General Machinery Corporation, Atlanta, Georgia in 1953. Original source and amount of starting capital has not been made available. That business was incorporated under Delaware laws April 18, 1955 as General Machinery Corporation of Wilmington, Delaware (Inc). According to a signed communication received from Grady E. Rozar, Attorney for John A. Miller the corporation was activated February 18, 1955 and assumed all legal obligations and took over the place of business of that proprietorship, General Machinery Company. That corporation was qualified to do business in Georgia on April 15, 1955 and it is reported to have used the trade style General Machinery Company. John A. Miller is reported to continue as President of General Machinery Corporation of Wilmington, Delaware (Inc), however, on November 18, 1959, Miller stated that the corporation had ceased operations. During its operating period, that corporation had a number of suits filed against it. During 1959 Miller began operating as above as was engaged as a manufacturer's agent selling new and used machinery. He formerly operated at 555 Northside Drive, N. W. During 1960 operations were terminated at that location and the company was reported to have owed past due rent of approximately $2,000.

"Recent efforts to contact John A. Miller have been unsuccessful due to his being reported out of town. The above captioned business address is a secretarial service where subject receives his mail.

"Complete details concerning Miller's current activities are not known at this time.
2–1 (8 58)"

Miller alleged in his complaint that the report was libelous per se and by innuendo, made wilfully and maliciously, that there was a complete absence of reasonable care and prudence in obtaining the facts from which the report was made and published, that Dun & Bradstreet was grossly negligent in its investigation in obtaining the facts, and that the report had caused him to lose business and profits. General and punitive damages were sought but no special damage was claimed.

Miller inferred the following innuendos from the report and alleged in his complaint that:

"The said libelous report by innuendo, inference, intimation, and imputation was meant and intended to convey that plaintiff was conducting a business at '555 Northside Dr. N.W.' and operating a business at several locations one of which was a false address; that no reliable information could be obtained about his early background but if it could be obtained it would be of a sordid nature in that he was a bastard and a member of the criminal underworld; that he was ignorant, uneducated, incompetent, senile, and of low mentality by stating 'that he attended high school at Tulane University;' that his 'associations have been reported to have been of short duration' due to his being irresponsible, incompetent, untrustworthy, undependable, and that no reasonable business man would hire him or do business with him; that he is a liar by stating that General Machinery Corporation had ceased doing business, that he will state one thing and do just the opposite, and that his word is no good; that due to 'a number of suits filed against' General Machinery Corporation it was the same as if they were filed against him, that he would not pay his debts unless forced to by a law suit, that he would be a bad credit risk, and that no distinction should be made between him and General Machinery Corporation due to both being bad credit risk; that Miller & Company 'owed past due rent of approximately $2,000,' that it would not pay its rent and there was no need to expect payment for goods sent on credit, and that credit should not be extended under any circumstances; that 'recent efforts to contact John A. Miller have been unsuccessful due to his being reported out of town' is based on well-founded reports that he moves from town to town without notifying any one; that he has to move around to avoid creditors and the law; that he is of dissolute character, and that he could never be found in order to collect a debt; and that 'Miller's current activities are not known at this time' due to his elusive character, and due to the fact that defendant has no employee in the criminal underworld by which contact could be made."

The report was sent by Dun & Bradstreet to Plattsburg Foundry at the latter's request, which request had been prompted by Miller's solicitation to represent Plattsburg in the wear parts field. After receiving the report Plattsburg Foundry wrote a letter on April 21, 1965 to Miller, stating that it would like Miller to see the report because it raised some questions about Miller & Company and Miller's personal background from a credit standpoint.[2]

2. The pertinent part of the letter is as follows:
"Dear Mr. Miller:
"Thank you for your letter of April 7 concerning the possible representation of Plattsburg Foundry & Machine Company in the wear parts field.
"Before a representation arrangement can be consummated, however, we would like you to look at a copy of the enclosed Dun & Bradstreet report which raises some questions about the background of Miller Company and, in particular, your personal background from a credit standpoint.
"Any association that Plattsburg Foundry and Machine Company has with any company regardless of what field it may be in is hopefully built on a successful foundation so that both companies may benefit from his partner's experience and reputation. I'm sure

Miller did not reply to the letter. One month later he filed this complaint. Motions by Dun & Bradstreet for dismissal, and subsequently for directed verdict, judgment notwithstanding the verdict and new trial were denied.

■ To constitute a libel under Georgia statutory law, there must be a published statement which is both false and defamatory, "tending to injure the reputation of an individual, and exposing him to public hatred, contempt or ridicule." [3] A charge "made against another in reference to his trade, office, or profession, calculated to injure him therein," although embodied in the definition of "slander," [4] gives rise to an action for libel as well, and a person against whom such an allegation is made need not allege or prove special damages.[5] Georgia recognizes that a cause of action exists for libel by innuendo as well as for libel per se. However, an alleged defamatory publication must be construed in the sense in which the readers to whom it is addressed would ordinarily, naturally and normally interpret it,[6] and plain, nondefamatory, unambigu-

ous words may not be enlarged by innuendo. In this regard the Supreme Court of Georgia held in Central of Georgia Ry. Co. v. Sheftall, 118 Ga. 865, 1903, 45 S.E. 687, 688:

"Words which are clearly not defamatory cannot have their natural meaning changed by innuendo. Words which are libelous per se do not need an innuendo. But between these two extremes are found many expressions which may be ambiguous, and the real meaning can then be explained by reference to the circumstances. It is for the jury in such instances to say whether, in view of all the facts, the writing was libelous."

In Garland v. State, 211 Ga. 44, 1954, 84 S.E.2d 9, 11, the Supreme Court of Georgia, citing the Central of Georgia Ry. case, said:

"The purpose of innuendo is to explain ambiguities in the charge made in the statement, and cannot introduce any new matter." [7]

The District Court, in trial conference while discussing the jury charges re-

you can appreciate this point of view and we hope to hear from you in the very near future."

3. Ga. Code Ann. § 105–701: "A libel is a false and malicious defamation of another, expressed in print, or writing, or pictures, or signs, tending to injure the reputation of an individual, and exposing him to public hatred, contempt, or ridicule. The publication of the libelous matter is essential to recovery."

4. Ga. Code Ann. § 105–702: "Slander, or oral defamation, consists, first, in imputing to another a crime punishable by law; or, second, charging him with having some contagious disorder, or being guilty of some debasing act which may exclude him from society; or, third, in charges made against another in reference to his trade, office, or profession, calculated to injure him therein; or, fourth, any disparaging words productive of special damage flowing naturally therefrom. In the last case, the special damage is essential to support the action; in the first three, damage is inferred."

5. The Georgia courts have engrafted the four slander categories into the libel stat-

ute, the result of which is that a libel falling into one of the first three slander categories is actionable without allegation or proof of special damages. Hardy v. Williamson, 86 Ga. 551, 1891, 12 S.E. 874; Southland Publishing Company v. Sewell, 111 Ga.App. 803, 1965, 143 S.E. 2d 428; Davis v. Macon Telegraph Publishing Company, 93 Ga.App. 633, 1956, 92 S.E.2d 619.

6. Garland v. State, 211 Ga. 44, 1954, 84 S.E.2d 9; Aiken v. May, 73 Ga.App. 502, 1946, 37 S.E.2d 225; Aiken v. Constitution Pub. Co., 72 Ga.App. 250, 1945, 33 S.E.2d 555; Haggard v. Shaw, 100 Ga. App. 813, 1959, 112 S.E.2d 286.

7. See also Park & Iverson v. The Piedmont & Arlington Life Ins. Co., 51 Ga. 510, 1874; Garland v. State, supra; Aiken v. May, supra; Aiken v. Constitution Pub. Co., supra; Haggard v. Shaw, supra; Southeastern Newspapers v. Walker, 76 Ga.App. 57, 1947, 44 S.E.2d 697; Estes v. Sterchi Bros. Stores, Inc., 50 Ga.App. 619, 1935, 179 S.E. 222.

quested by counsel, correctly ruled that the involved report was not libelous per se and refused to give a charge on that subject. In his order denying defendant's motions for judgment notwithstanding the verdict and, alternatively, for a new trial, the District Judge reiterated that the report in question "was not libelous per se under Georgia law," but held, nevertheless, that "This left a jury question as to whether it was libelous in fact." In this connection the District Court charged the jury as follows:

"Now, certain words, such as a direct charge of commission of a serious crime, are considered to be libelous in themselves. Other words such as praise for good character can never be defamatory. Between these two extremes lies the case of ambiguous or uncertain language where it is for the jury to say whether in view of all the facts charged the publication amounts to a libel or not. . . . words harmless in themselves may become libelous when the circumstances under which they are published are such as to confer a covert or secret meaning to the reader, reflecting injuriously upon the reputation of the person to whom they refer. All in all, you must determine for yourselves, as a common sense matter, under all the facts and circumstances of this case, whether this particular report here constitutes libel or not."

Although the charge correctly reflects the law of Georgia where in fact a statement contains ambiguous language, the Court erred in sending the case to the jury. Although Georgia law clearly contemplates allowing a jury in a libel case to determine the effect of ambiguous language, it does not contemplate submission of the question of liability where no ambiguity appears and the statements are not libelous per se. The law of Georgia is consistent in requiring the factor of ambiguous language as a prerequisite for the employment of innuendo.[8] The only segments of the report which could have possibly been construed as defamatory were the statements referring to past due rent of approximately $2,000 owed by General Machinery Company and to the suits filed against General Machinery Corporation. Truth, of course, is a complete defense to a charge of libel,[9] and appellant conclusively proved by testimony and documentary evidence both of these statements.[10] The remaining portions of the report are plain, harmless and not reasonably susceptible of reflecting injury upon the reputation of appellee so as to justify jury consideration. The innuendos charged are so farfetched, forced and strained that we are unable to see any relationship between them and the remaining statements in the report.

A motion for judgment notwithstanding the verdict is actually a

8. See Note 6, supra.

9. Ga. Code Ann. § 105–708: "The truth of the charge made may always be proved in justification of the libel or slander." See also Henderson v. Fox, 83 Ga. 233, 1889, 9 S.E. 839; Savannah News-Press, Inc. v. Hartridge, 110 Ga.App. 203, 1964, 138 S.E.2d 173, and the various cases cited therein.

10. Plaintiff, through counsel, admitted at the trial that certain suits had been filed against General Machinery Corporation. His answers to interrogatories admit the filing and reduction to judgment of eight separate suits against the corporation, which judgments have not been paid or satisfied.

Plaintiffs also admitted in answers to interrogatories that rent for the North Avenue property for the months March–July 1960, at the rate of $400 per month, a total of $2,000, had not been paid. He made the transparent contention, however, that defendant's report was untrue, by averring that under the terms of the special stipulation in the written lease of the premises, since there was a building worth $10,000 erected on the vacant property which was to serve as additional *security* for the lease, no rent was due. The record is without factual contradiction that the rent was actually due which defendant's report said was owed by the corporation.

renewal of a previous motion for a directed verdict and the standard is the same for both motions as to when they should be granted, 2B Barron and Holtzoff (Wright Ed.) § 1075, p. 375; both raise only questions of law. Id. § 1075, pp. 384–385; Glazer v. Glazer, 5 Cir., 1967, 374 F.2d 390, 400. The test employed by this circuit in considering the necessity for jury determination is that a fact issue must be submitted to the jury if reasonable men could differ on the conclusions to be reached from the evidence; the evidence and all reasonable inferences must be viewed most favorably to the party against whom the motion is made, and only the evidence and the reasonable inferences which support the opposing party's theory may be considered. Helene Curtis Industries, Inc. v. Pruitt, 5 Cir., 1967, 385 F.2d 841, 850; Turner v. Atlantic Coast Line Railroad Company, 5 Cir., 1961, 292 F.2d 586.[11]

■ In determining, therefore, whether the Trial Judge should have granted appellant's motions we consider the evidence of record and the inferences which appellee urges may reasonably be drawn therefrom.

■ Appellee started the General Machinery Company in 1950, 1951 or 1952. (The report states that the *corporation* was started in 1953.) The corporation was incorporated on February 18, 1955. (The report shows the date to be April 18, 1955. Appellee contends that these two false statements taken together with the statement, "That corporation was qualified to do business in Georgia on April 15, 1955," imply that he was a criminal by virtue of operating an unlicensed business prior to its incorporation in violation of the law.) Appellee states that he was available to furnish information sought by Dun & Bradstreet which appellant could have obtained by a visit to his home or by letter. (The report states that "Re-

peated and continued efforts to verify information submitted concerning subject's background have been largely unsuccessful." Appellee contends that the connotation here is that he is running from the law and his creditors; that he is a "bastard" and of a "sordid nature.") The testimony of defendant's representative (Mr. Fluehr) was that he telephoned plaintiff at his business address —actually an answering service address—and was not able to reach him, being told he was out of town. Appellee, who, despite lack of a college degree, is a professional engineer, completed courses at Tulane University in "Statics and Strength of Materials," "Machine Design," and "Theoretical Naval Architecture and Marine Engineering." (The report states that "Miller has stated that he attended high school at Tulane University, New Orleans for one quarter, taking courses in naval architecture and marine engineering." This statement, appellee contends, was a "deliberate fabrication" made to "downgrade" him and cause him to "appear stupid, senile, and uneducated.") When appellee was approximately 22 years old, Helis Oil Company, by whom his sister was then employed as a petroleum engineer, subcontracted work to him and two associates through his sister. (The report states that "During early manhood [Miller] worked at New Orleans for his sister." Appellee contends that this was a deliberate, malicious attempt by appellant to malign and hurt him.) Appellee states that he was in charge of the Naval and Marine Section of the War Production Board at New Orleans. (The report shows that he was employed by the War Production Board.) Appellee enlisted in the Army in 1936. (The report shows the date to be 1942.)

Considering all of the evidence and reasonable inferences favorable to appellee, we can find no evidentiary basis for the jury's verdict, for the report itself contains no defamatory language or am-

---

11. See also Equitable Life Assur. Society of United States v. Fry, 5 Cir., 1967, 386 F.2d 239; Liberty Mutual Insurance Company v. Falgoust, 5 Cir., 1967, 386 F.2d 248.

biguities. We can only surmise that the highly inflammatory and hostile remarks of appellee's counsel in closing argument caused the jury to succumb to prejudice and sympathy, resulting in an unjust verdict.[12] While it is our opinion that the District Court should have stopped appellee's counsel and instructed the jury to ignore the improper remarks when they were made, despite failure of

12. The following excerpts are typical of the final summation by appellee's counsel to the jury:

"They [Dun & Bradstreet] make money on the miseries of these poor businessmen who are trying to get a start, the American way of life. We did without Dun & Bradstreet for over a hundred years, and I can see right now how we can do without them for another thousand years. They thrive and feed on misery, and that's all. Brother, if you have got any misery, they can make money out of it. * * * they are masters of the doubletalk. * * * It is my humble opinion that a credit agency who reports on this is a more menace to society than the Fifth Column was during World War II due to the simple fact it undermines the faith of a small businessman. They are talking about billion-dollar businesses. * * * They care nothing about the little man, whether he lives or dies. They are not interested in the little man. Can you conceive of a situation where a man is down on his back, praying to the Almighty, visualize a situation like this, he is praying to the Almighty, here you have got Dun & Bradstreet standing behind him in the form of a devil with a pitchfork ready to stick him in the back about the time he gets ready to pick himself up. It is a demoniac evil this country ought to erase, because it pits neighbor against neighbor. Have you ever had these people coming around to your house trying to find out information about your neighbor? I make no bones about this. I have got a lot of feelings in this case and I am not making any bones about it. They are a menace to society. They serve no earthly purpose. This country wasn't built on credit reports. Supposing a man is down on his back, and maybe if you just held off a little longer, gave him an opportunity, maybe he would get up. Maybe the situation might work itself out. But you have got some collection agencies, which Dun & Bradstreet is one of them, where you don't have a chance. You just miss one payment, brother, and you are out cold. * * * Failure, do you know what it is to be a failure, to be sick four months? Can you imagine a man over fifty years old,

he can't even get a job, he is destitute? Here Dun & Bradstreet, he is about to get ready to get on his feet, it is like a hungry child, if you have a piece of bread in his mouth and suddenly he is about ready to get back on his feet and suddenly Dun & Bradstreet grabs the bread out of his mouth, he is back down on his knees. You don't have a chance. You have got to be big or you don't exist. The little man no longer has a chance. You have no rights. You know how some of these collection agencies work. They feed on misery. They try to run you out of business. They try to liquidate your assets by suits. * * * You can't hurt Dun & Bradstreet. It doesn't matter what you do. They are just too big. You can't hurt them. The only thing you can do, you can compensate him for the skullduggery they have done to Mr. Miller, just point blank lies. * * * You have got to put a stop to it. Your grandchildren and mine won't have a chance if you don't put a stop to this type of operation. Have you read George Orwell's Big Brother—I mean, George Orwell's '1984' where Big Brother knows everything, does everything. It eliminates all initiative. They tell you when to get up, when to go to bed, they invade your privacy, you have nothing. You are just a skeleton. You are just a walking robot. That is what we are coming to. But it is about time we put a stop to that. It is about time we got rid of this menace, and I say to you it is a menace. There is no greater menace on earth than an organization like Dun & Bradstreet who preys on your misery and misfortune and goes around and asks your neighbors questions, which if your neighbors don't like you they are going to lie on you, lie to the investigators. * * * You don't do anything to one of these big corporations and get away with it. You think so? There is a million ways they can hound you to high Heaven until you are finally in the grave. Then there is only one thing to do, when they run you out of business, you have either got to commit suicide or starve to death, one or the other, and they don't care less."

appellant's counsel to object, our decision is not based on this excessive argument, which would require a new trial. We hold that because of the lack of an evidentiary basis for the verdict, the District Court erred in denying the motions for a directed verdict or judgment notwithstanding the verdict.

We reiterate what we said in Stewart v. Gilmore, 5 Cir., 1963, 323 F.2d 389, 391:

"When the ends of justice require it, a federal trial judge has the power and the duty to set aside a jury's verdict, to grant a new trial, or to grant a judgment notwithstanding the verdict. The appellate court has a corresponding responsibility."

The exercise of sound judicial discretion demands that the verdict be set aside. For the reasons stated it is unnecessary to discuss additional errors urged by appellant.

Reversed and remanded with directions to enter judgment in favor of appellant, dismissing appellee's suit at his cost.