UNITED STATES of America FEDERAL
COMMUNICATIONS COMMISSION,
Plaintiff,

v.

SUMMA CORPORATION, LAS VEGAS,
NEVADA, Licensee of
KLAS–TV, Defendant.

Civil No. LV–76–53 BRT.

United States District Court,
D. Nevada.

March 22, 1978.

924

Michael H. Cohn, Atty., Civ. Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Hogan & Hartson, Edgar W. Holtz and Gardner F. Gillespie, Washington, D. C., for defendant.

## ORDER

BRUCE R. THOMPSON, District Judge.

The government instituted this action to recover a $500.00 forfeiture assessed by the Federal Communications Commission (FCC) against Summa Corporation, licensee of KLAS–TV, Las Vegas, Nevada, for what the FCC found was a "repeated" violation of the equal opportunities provisions of the Communications Act of 1934. 47 U.S.C. §§ 315 and 503. Both parties have moved for summary judgment.

This case is set against the backdrop of the 1972 Democratic primary, in which James Bilbray defeated long-time Congressman Walter Baring's bid for re-election to the Nevada at-large Congressional seat. Election day was September 5, 1972. In July, Mr. Bilbray purchased a series of 30-second spots from KLAS–TV. Then, and at other times thereafter, Mark Smith, station manager of KLAS–TV, contacted James Rosner, Congressman Baring's advertising manager, urging him to purchase comparable spots. For strategy reasons, Rosner declined.

As the election approached, Rosner recanted his earlier position. On August 24th he called KLAS–TV, requesting spot availabilities to run from September 1st to September 4th, election eve. On August 25th, the station supplied its list of availabilities. Dissatisfied with the list submitted, Rosner met with station personnel on August 28th. Rosner requested additional time slots for August 31st. This request was honored and, in an effort to accommodate Rosner's other demands, the station agreed to preempt several of its commercial advertisers. Rosner was still dissatisfied and on August 29th he sent a telegram to Mr. Smith, formally demanding "[e]qual opportunities as defined by the Federal Communications Commission under Section 315 of the Communications Act of 1934, in reference to James Bilbray."

After the election, Rosner complained to the FCC, which issued a Notice of Apparent Liability for "willful or repeated" violation of section 315. Summa protested and fur-

ther proceedings were had. FCC regulations provide that "[a] request for equal opportunities must be submitted to the licensee within 1 week of the day on which the first prior use, giving rise to the right of equal opportunities, occurred." 47 C.F.R. § 73.657(e) (1976). Relying on this "Seven-Day Rule," the FCC concluded that Congressman Baring should ·have been granted as many spots as Mr. Bilbray had aired in the week preceding Rosner's August 29th demand. It further held that Congressman Baring was entitled, *in addition*, to as many spots as were scheduled to run on behalf of Mr. Bilbray from August 29—September 4. *Compare Use of Broadcast Facilities by Candidates for Public Office*, 35 Fed.Reg. 13048, 13067 at Q & A IX. 5. (1970). Taking August 22—September 4 as the critical period, the FCC found that Summa had "repeatedly" violated section 315 of the Act, affording Mr. Bilbray a total of twenty-seven class "A" and "AA" spots while giving Congressman Baring only twenty. The fact that, measured from August 31—September 4, Congressman Baring received nine more spots than did Mr. Bilbray, was held immaterial.

A forfeiture of $500.00 was assessed. Summa refused to pay and the government instituted this action pursuant to 47 U.S.C. § 504, which provides for a trial *de novo* in district court in cases involving disputed FCC forfeiture orders. Jurisdiction is conferred by 28 U.S.C. § 1355.

█ It follows from the grant of trial *de novo* jurisdiction to the district courts that this court is not limited to a review of the administrative record before the FCC, nor do the findings and conclusions of the Commission *in this case* carry any weight whatsoever. *Pleasant Broadcasting Co. v. F. C. C.*, 564 F.2d 496 (D.C.Cir.1977); *United States v. Daniels*, 418 F.Supp. 1074 (D.S.D. 1976). The words "de novo" mean that "the court should make an independent determination of the issues." *United States v. First City National Bank of Houston*, 386 U.S. 361, 368, 87 S.Ct. 1088, 1093, 18 L.Ed.2d 151 (1967). *Cf. United States v. Daniels*, supra. Such full *de novo* review is quite appropriate in this sort of case inasmuch as the Commission is both prosecutor and judge in forfeiture proceedings under 47 U.S.C. § 503.

In this case the issues were framed by a "written notice of apparent liability" served by the Commission. This is a lengthy letter dated August 21, 1973, which purports to state in detail the factual background for the charge and concludes that "it would appear that your failure to fully honor complainant's requests for 'equal opportunities' on Mr. Baring's behalf constituted a willful or repeated violation of section 315a of the Communications Act of 1934 as amended." Thus the issues are: (1) did defendant fail to afford equal opportunities; (2) did the defendant do so willfully; or (3) did defendant do so repeatedly, and (4) was the penalty assessed appropriate.

Summa has propounded numerous theories in support of its motion for summary judgment. Chiefly it contends that no "repeated" violation within the meaning of 47 U.S.C. § 503(b)(1)(B) occurred and that there is thus no statutory basis for the imposition of a forfeiture. Three arguments are advanced to support this contention: that no "repeated" violation of section 315 can occur with respect to one candidate in one election; that no "repeated" violation can be found here since Rosner made only one demand for equal opportunities; and finally, that no violation is "repeated" unless persisted in after Commission warning.[1] The government counters by contend-

---

1. Summa also argues that the FCC's holding that a candidate need not specifically invoke the "Seven Day Rule" in order to claim entitlement under it constitutes an impermissible *ex post facto* departure from prior FCC law. The "Seven Day Rule" is in the nature of a statute of limitations, a shield for the broadcaster rather than a sword for an aggrieved candidate. *See* Comment, FCC Implementation of the Sec-

tion 315(a) Exemptions: The Disappearance of the Equal Time Doctrine, 6 U.Balt.L.Rev. 70, 74–5 (1976). The substantive "right" at issue is that of "equal opportunities." If section 315 *of the Act has been adequately invoked, it is* the broadcaster not the aggrieved candidate who is entitled to assert the "Seven Day Rule" as his defense.

ing that each day a broadcaster persists in its refusal to honor an equal opportunities request a new and therefore "repeated" violation occurs.

■ Each of these arguments seems predicated on a common misunderstanding of the interplay between 47 U.S.C. §§ 315 and 503. Section 503 is strictly remedial, authorizing the FCC to impose forfeitures for a wide array of Communications Act violations:

"(b)(1) Any licensee or permittee of a broadcast station who—

"(A) willfully or repeatedly fails to operate such station substantially as set forth in his license or permit,

"(B) willfully or repeatedly fails to observe any of the provisions of this chapter or of any rule or regulation of the Commission prescribed under authority of this chapter or under authority of any treaty ratified by the United States,

"(C) fails to observe any final cease and desist order issued by the Commission,

"(D) violates section 317(c) or section 509(a)(4) of this title [47 USCS §§ 317(c), 509(a)(4)], or

"(E) violates section 1304, 1343, or 1464 of title 18, [of the United States Code 18 USCS §§ 1304, 1343, 1464],

shall forfeit to the United States a sum not to exceed $1,000. *Each day during which such violation occurs shall constitute a separate offense.* Such forfeiture shall be in addition to any other penalty provided by this chapter."

47 U.S.C. § 503(b)(1) (emphasis added). The provision that each day a violation continues constitutes a "separate offense" is ambiguous, and arguably admits of the government's construction that a single violation is "repeated" merely because persisted in for several days. However, the House Report accompanying proposed section 503 states:

"[This statute] would amend the Act to authorize the Commission to impose forfeitures on licensees and permittees of broadcast stations of up to *$1000 a day* for certain violations."

H.R.Rep.No.1800, 2 U.S.Code Cong. & Admin.News, pp. 3516, 3525 (1960) (emphasis added). This statement suggests that the "separate offense" provision should be read as modifying only the sentence which precedes it, affecting the amount of forfeiture and not the substantive violations for which a forfeiture can be assessed. That a violation continued for several days thus does not, *eo ipso,* render it "repeated." *Compare* 47 U.S.C. § 503(b)(1) with *id.* § 312(a)(4) (source of "willful or repeated" contains no "per day" provision).

■ Whether a "repeated" violation occurred depends instead on the statute whose substantive provisions are alleged to have been breached, in this case, 47 U.S.C. § 315:

"(a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station . . .

.     .     .     .     .

"(d) The Commission shall prescribe appropriate rules and regulations to carry out the provisions of this section."

Pursuant to its delegated authority, the FCC has defined a "use" giving rise to a right of equal opportunities as any broadcast appearance by a legally qualified candidate, "no matter how brief or perfunctory." Use of Broadcast Facilities by Candidates for Public Office, 35 Fed.Reg. at 13050, Q & A III.B.3. A broadcaster who allows a candidate to make an appearance for which equal opportunities are denied his opponents violates section 315. If he permits more than one such appearance, he potentially commits a "repeated" violation.

The purpose of section 315 is "to require a broadcaster to treat equally all candidates for a particular office or nomination once the broadcaster has made his facilities available to any one of the candidates." *Paulsen v. FCC,* 491 F.2d 887, 889 (9th Cir. 1974). Campaigns are conducted over a short period of time. Radio and television

play an increasingly important role in the political process. Although complaints are given priority consideration an aggrieved candidate will rarely be able to set FCC machinery in motion to compel meaningful compliance with the Act. See *Derby*, Section 315, Analysis and Proposal, 3 Harv.J. Legis. 257, 311–15 (1966). The scrupulous attention to the equal opportunities principles that the Act, indeed the political process, demands thus depends in large part on informal negotiations between broadcasters and candidates seeking broadcast time. *See* Use of Broadcast Facilities by Candidates for Public Office, 35 Fed.Reg. at 13048. Since injunctive and compensatory relief are denied an aggrieved candidate, *cf. Daly v. C. B. S., Inc.*, 309 F.2d 83 (7th Cir. 1960), his bargaining power lies solely in his ability to demonstrate an entitlement which if denied, will lay the groundwork for subsequent FCC sanction.

■ To define "use" collectively as Summa would in its argument that there can be no "repeated" violation with regard to one candidate, in one election, would limit FCC action to cases involving only the most flagrant disregard of the equal opportunities provisions of the Act. The FCC has seen fit, however, to find separate violations which, taken together, warrant the imposition of a forfeiture,[2] each time a station allows a candidate air time but denies equal opportunities to his opponent. Given its due deference and in light of the considerations outlined above, this interpretation seems reasonable and necessary to achieve the important and legitimate objective of effectively preventing unfair and unequal use of the broadcast media.

■ It is the number of "uses" for which equal opportunities are denied, moreover, not the number of equal opportunities requests that were made, that determines the number of violations. An aggrieved candidate, of course, must comply with the seven-day limitation period provided in 47

C.F.R. § 73.657(e), supra. Assuming the request was timely made with respect to the prior uses for which equal opportunities are sought, no useful purpose, save that of creating additional pitfalls and paperwork, would be served by requiring daily requests. Summa's argument that no "repeated" violation occurred because Rosner made only one demand, thus misses the mark.

■ Nothing in the legislative history of section 503 supports Summa's contention that Congress intended to restrict the FCC in finding a "repeated" violation to cases in which a violation continued in the face of an official FCC warning. Many of the cases decided under 47 U.S.C. § 312, the revocation statute from which the "willful or repeated" language contained in 47 U.S.C. § 503(b)(1)(B) was drawn, did involve a failure to respond to an official FCC notice. However, in most the substantive offense at issue was that of failing to respond to Commission correspondence regarding technical violations, as mandated by 47 C.F.R. § 1.61 (1976). *See Patterson Shrimp Co., Inc.*, 29 F.C.C. 1049 (1960); *Vernon F. Crotts*, 28 F.C.C. 772 (1960); *Barry O'Leary, Inc.*, 28 F.C.C. 11 (1960). The Committee report accompanying proposed section 503 expressly states that the forfeiture provision was adopted to supply the FCC with an effective alternative to the more drastic revocation procedures to punish relatively minor infractions of the Act.

"The inadequacies of present administrative sanctions available to the FCC have been referred to in connection with the provisions pertaining to suspension of licenses. These considerations prompted the FCC to recommend that it be given the power to impose monetary forfeitures on broadcast licensees. It expressed the view that this would provide it with an effective tool in dealing with violations in situations where revocation or suspension does not appear to be appropriate."

---

**2.** In reaching the conclusion that the FCC interpretation of "repeated" is reasonable in the forfeiture context, I express no conclusion whether a similar interpretation would be appropriate in a revocation proceeding. The differing property interests at stake may well warrant differing definitions in the two contexts.

2 U.S.Code Cong. & Admin.News, pp. 3516, 3525 (1960). The phrase "willful or repeated" is written in the disjunctive. To require prior Commission warning as the predicate for a finding of a "repeated" violation, would render "repeated" substantially identical to "willful." Such a construction is unwarranted. *Accord, United States v. Daniels,* 418 F.Supp. 1074, 1081 (D.S.D. 1976).

It does not follow from the foregoing that the government is entitled to summary judgment as a matter of law. In the ordinary situation, clarity and definiteness may warrant holding that a candidate who timely requests equal opportunities is automatically entitled to the same number of spots as his opponent aired the preceding week as well as to the number of fixed and definite spots scheduled to run the week following. If such a request is made six weeks or two months before an election, the spots awarded can be interspersed so as not to prejudice the candidate whose prior appearances gave rise to the equal opportunities demand. A candidate who waits until the last week of the election to make his demand, however, places the broadcaster in a position in which a request encompassing both retrospective and prospective uses can only be honored by affording the complaining candidate twice as many spots as his opponent in the critical days immediately preceding an election. Such a rule, if strictly followed, would invite manipulation and abuse leading to the very unfair and unequal allocation of broadcast resources that section 315 was designed to prevent. *See* Friedenthal & Medalie, The Impact of Federal Regulation on Political Broadcasting: Section 315 of the Communications Act, 72 Harv.L.Rev. 445, 456–57 (1959).

The FCC itself has recognized that section 315 refers to "equal opportunities", not equal time, and that there is thus no obligation "to make available exactly the same time periods, nor the periods requested by [the complaining] candidate." Use of Broadcast Facilities by Candidates for Public Office, 35 Fed.Reg. at 13061, Q & A VI. B. 2. The time periods offered must only be "comparable as to desirability." *Letter to Senate Committee on Commerce,* 40 F.C.C. 357, 360 (1962). Furthermore, the FCC has taken the position that a candidate's entitlement to equal opportunities when he has been offered but initially declined to accept spots provided depends on "all of the facts and circumstances then obtaining." *Letter to Leonard H. Marks, Esq.,* 40 F.C.C. 272 (1956); *see Letter to Hon. Allen Oakley Hunter,* 40 F.C.C. 246 (1952). Thus, in discussing a candidate's rights to equal time where he had originally declined to avail himself of opportunities offered and accepted by his opponent for the last week of a campaign, the FCC has stated that "comparability" depends on:

"(a) the total amount of time presently scheduled for each candidate; (b) the time segments presently offered to candidate A; (c) the time segments presently scheduled for candidate A's opponent and previously rejected by candidate A; (d) the time segments now scheduled for candidates for other offices; and (e) the station's possible obligations to other candidates for office."

Use of Broadcast Facilities by Candidates for Public Office, 35 Fed.Reg. at 13060 Q & A VI. A. 10; *see Telegram to Major General Harry Johnson,* 40 F.C.C. 323 (1961).

That Mr. Bilbray received seven more "uses" in the two weeks preceding the election than did Congressman Baring in the five days for which Rosner requested availabilities thus does not establish that "equal opportunities" were denied. *Cf. Lamb v. Sutton,* 164 F.Supp. 928, 935–36 (M.D.Tenn.1958). Comparability, however, is an issue of fact and renders summary judgment inappropriate at this time. Thus the government is entitled to demonstrate that the time provided was not, in fact, comparable. Factors important to this determination include the difference in desirability as to air time five days as opposed to two weeks prior to an election, the impact of a nearly two-to-one air time ratio in the five days immediately preceding an election, the extent to which Rosner's delay in requesting equal opportunities affected the opportunities to which he was entitled, and

last, whether the FCC's refusal to weigh these factors constituted an impermissible departure from prior law.

Whether or not defendant acted "willfully" is also a question of fact which precludes summary judgment. The pretrial order details many issues of fact which, if resolved by evidence at the trial, may have substantial relevance to the issue of wilfulness. Resolution of these same issues may also enable the court to find as a fact whether or not there had been "repeated" violations without relying upon the rather esoteric reasoning which we have tentatively accepted in earlier portions of this order.

In consideration of the premises,

*IT IS HEREBY ORDERED* that Summa's motion for summary judgment be, and it hereby is, denied; and

. *IT IS FURTHER ORDERED* that the government's motion for summary judgment be, and it hereby is, denied.