**UNITED STATES of America, Plaintiff,**

v.

**WIYN RADIO, INC., Licensee of Radio Station WIYN, Defendant.**

**Civ. A. No. C77–65R.**

United States District Court,
N. D. Georgia,
Rome Division.

Dec. 15, 1978.

William E. Turnipseed, Asst. U. S. Atty., Atlanta, Ga., Kathleen B. Levitz, Dept. of Justice, John P. Greenspan, Federal Communications Com'n, Washington, D. C., for plaintiff.

Morton L. Berfield, Cohen & Berfield, Washington, D. C., for defendant.

## ORDER

MURPHY, District Judge.

### STATEMENT OF THE CASE

The United States instituted this suit to recover a forfeiture imposed by the Federal Communications Commission upon defendant WIYN for repeated violations of the personal attack rule, 47 C.F.R. § 73.123(a). In the trial of this case both plaintiff and defendant presented testimonial and documentary evidence. At the close of trial, the Court requested that the parties submit

proposed findings of fact, conclusions of law, and post-trial briefs addressing: (1) the permissible scope of the Court's authority to review the facts surrounding the imposition of the forfeiture; (2) the meaning of "repeated" as used in 47 U.S.C. § 503(b)(1)(B); and (3) such other issues as counsel wished to bring to the Court's attention.

Defendant was a licensee of standard broadcast station WIYN in Rome, Georgia, on April 23, 1971. On that date during the broadcast of the program *Comment* the Commentator made statements the United States contends violated the personal attack rule. Defendant is alleged to have never notified the subject of the attack of the April 23, 1971 broadcast. On May 20, 1971, a request was made for time to reply.

On July 28, 1971, the Commission issued a Notice of Apparent Liability for Forfeiture in the amount of $1000.00 for defendant's alleged violations of the Federal Communications Commission Rules and Regulations. In a decision of May 24, 1972, the Federal Communications Commission found defendant had repeatedly violated its rules and ordered defendant to pay a $1000.00 forfeiture. On May 28, 1975 the Commission denied reconsideration of its order. This action is before this Court in an effort to recover the forfeiture.

## ISSUES AND FINDINGS

This forfeiture action was brought as a result of the Commission's finding that defendant repeatedly failed to meet the duties imposed upon it under the personal attack doctrine. The government brought this suit pursuant to 47 U.S.C. § 504(a) which provides:

The forfeitures provided for in this chapter . . . shall be recoverable in a civil suit in the name of the United States brought in the district where the person . . . has its principal operating office . . . : *provided,* That any suit for the recovery of a forfeiture imposed pursuant to the provisions of this chapter shall be a trial de novo . . . .

In a trial de novo to collect this civil penalty, the Commission's "decision to seek enforcement becomes . . . not an adjudication but merely a decision to prosecute." *United States v. International Harvester Co.,* 387 F.Supp. 1338, 1340 (D.D.C.1974).

The personal attack rule, codified at 47 C.F.R. § 73.123(a), requires a licensee to notify a person or organization who is the subject of an attack upon its honesty, integrity or some like personal quality, within seven days of the attack's occurrence, to provide a script or tape of the attack and to take the initiative in offering a reasonable opportunity to reply over the licensee's facilities. *Straus Communications, Inc. v. F.C.C.,* 174 U.S.App.D.C. 149, 530 F.2d 1001, 1007 (1976). For the rule to be invoked, however, the attack must have occurred within the context of a discussion of a controversial issue of public importance. *Id.* 174 U.S.App.D.C. at 155, 530 F.2d at 1008; *Personal Attacks, Political Editorials,* 8 F.C. C.2d 721, 725 (1967). Thus to prevail in this action, plaintiff must establish:

(1) that the statements of Reverend Scruton concerning IAD and its newsletter, *HOMEFRONT,* constituted an attack upon the honesty, character, integrity or like personal qualities of IAD and *HOMEFRONT*;

(2) that this attack occurred during the presentation of views on a controversial issue of public importance; and

(3) that the defendant failed repeatedly to comply with the notice and offer requirements of the personal attack rule.

The April 23 broadcast contained the following statements:

You have the organization, you have its head, and you have its papers. Now who can deny that HOMEFRONT is a publication of a subversive organization and certainly its head is an avowed Communist. . . . [His] HOMEFRONT magazine and [his] IAD are definitely subversive. They are to the Far Left . . . .

In determining what would constitute a personal attack, "the contemporaneous attitude becomes all-important, temporary though it may be." L. Yankwich, *Trends in Law Affecting Communication,* 15 F.R.D. 291, 294 (1954); *accord, Utah State Farm*

*Bureau Federation v. National Farmers Union Service Corp.*, 198 F.2d 20 (10th Cir. 1952). And as Yankwich observed:

"And it is of little moment whether the statement describes plaintiff [in a libel suit] as a communist or as one having communistic sympathies and affiliations for, as has been observed, 'any difference is one of degree only.' . . .

Since the end of the second World War, and the rise of Russian expansionism with its absorption of bordering eastern countries, . . . the term 'Communism' means the Russian type which has brought on the cold war, the attack in Korea, . . . under the fiction of 'Chinese volunteers,' and has sought, through revolution and rebellion, to stir up unrest throughout the world. Because the words 'Communism' and 'Communist' connote this type of movement, in democratic countries, especially in the United States, they are words of opprobrium. . . . "

Thus courts have consistently held since the second World War that writing or speaking of a person or organization as being a "communist" or "communist sympathizer" may subject that person or organization to such public hatred and contempt that it constitutes libel. *See, e. g., Joint Anti-Fascist Refugee Commission v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1950); *Utah State Farm Bureau Federation v. National Farmers Union Service Corp., supra; Spanel v. Pegler*, 160 F.2d 619 (7th Cir. 1947); *Grant v. Reader's Digest Association*, 151 F.2d 733 (2d Cir. 1945), *cert. denied*, 326 U.S. 797, 66 S.Ct. 492, 90 L.Ed. 485 (1946); *Foltz v. News Syndicate Co., Inc.*, 114 F.Supp. 599 (S.D.N.Y.1953); *Cole v. Loew's, Inc.*, 8 F.R.D. 508 (S.D.Cal.1948) *reversed on other grounds*, 185 F.2d 641 (9th Cir. 1950), *cert. denied*, 340 U.S. 954, 71 S.Ct. 570, 95 L.Ed. 688 (1951); *see also Gertz v. Welch*, 306 F.Supp. 310 (N.D.Ill.1969), verdict set aside on other grounds, 322 F.Supp. 997

(N.D.Ill.1970), affirmed 471 F.2d 801 (9th Cir. 1972), *reversed*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

 Recognition of contemporaneous attitudes becomes particularly important when the words comprising an alleged attack upon a person's character may not be defamatory on their face because:

Words which are clearly not defamatory cannot have their natural meaning changed by innuendo. Words which are libelous per se do not need an innuendo. But between these two extremes are found many expressions which may be ambiguous, and the real meaning can then be explained by reference to the circumstances. *Central of Georgia Railway Co. v. Sheftall*, 118 Ga. 865, 45 S.E. 687 (1903).

In such a case, the meaning of the words becomes a question of fact. *Dun & Bradstreet, Inc. v. Miller*, 398 F.2d 218 (5th Cir. 1968); *Spanel v. Pegler, supra* at 623; *Foltz v. News Syndicate Co., Inc., supra* at 603. To determine whether a statement is defamatory, it must be construed in the sense in which those to whom it is addressed would ordinarily, naturally and normally interpret it. *Dun & Bradstreet, Inc. v. Miller, supra* at 222; *Holden v. American News Co.*, 52 F.Supp. 24 (E.D.Wash.1943), *appeal dismissed*, 144 F.2d 249 (9th Cir. 1944). That a statement is defamatory may be established "by a showing of [its] particular meaning in context or by evidence of circumstances outside the [broadcast] which render the words defamatory." *Hood v. Dun & Bradstreet, Inc.*, 335 F.Supp. 170, 175 (N.D.Ga.1971), reversed on other grounds, 486 F.2d 25 (5th Cir. 1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1580, 39 L.Ed.2d 882 (1974).

In the April 23 broadcast, neither IAD nor HOMEFRONT was explicitly called "Communist." Instead both were labelled "subversive"[1] and "to the Far Left"[2]; and

---

1. The Random House College Dictionary (1973) defines "subversive" at p. 1311 to mean: tending to subvert or advocating subversion, esp. in an attempt to overthrow or cause the destruction of an established or legally constituted government.

2. A recognized meaning of the term "left" is: *a.* The individuals and groups pursuing generally egalitarian political goals by reformist or revolutionary means, in opposition to broadly conservative, established, or reactionary interests. *b.* The relative degree of

the former was characterized as headed by "an avowed Communist" who was "bent on infiltrating the Methodist Church in its entirety."

In 1960 Congress amended the Communications Act of 1934, 47 U.S.C. § 151 et seq., to provide for the imposition and collection of forfeitures assessed by the Commission for certain violations of the provisions of the Act and of its rules and regulations. The forfeitures were to be imposed in accord with the provisions of 47 U.S.C. § 503, while 47 U.S.C. § 504 governed the procedures for their collection.

The choice of language in Section 504(a), that "any suit for the recovery of a forfeiture . . . shall be a trial de novo," reflects congressional rejection of a scheme requiring a judicial review restricted to the administrative record and circumscribed by the requirements of the Administrative Procedure Act.[3] The review contemplated by Congress was a trial on the merits in which the person against whom the forfeiture is ordered is given an opportunity to contest the action of the Commission.

Other Courts in which forfeiture violation proceedings have been brought have recognized that the language of Section 504(a) mandates a full review of disputed facts in the district court, even of those facts not previously brought to the Commission's attention. See, e. g., United States v. Summa

Corporation, 447 F.Supp. 923, 928–929 (D.Nev.1978); United States v. Daniels, 418 F.Supp. 1074, 1080–81 (D.S.C.1976).

The statutory scheme provides that, prior to its assessing a forfeiture against a licensee, the Commission send the licensee a written notice containing the following information:

A notice issued under this paragraph shall not be valid unless it sets forth the date, facts, and nature of the act or omission with which the licensee or permittee is charged and specifically identifies the particular provision or provisions of the law, rule, or regulation . . . involved. 47 U.S.C. § 503(b)(2).

■ The Notice of Apparent Liability sent to defendant WIYN, Defendant's Exhibit No. 2, specifically identifies the date of the broadcast, the date on which defendant finally offered reply time to IAD and Section 73.123(a), the personal attack rule. In addition, the notice includes the name of the program on which the attack allegedly occurred and refers to the acts and omissions of the licensee following the broadcast which led to issuance of the notice. The notice also incorporates by reference the transcript of that portion of the program containing the alleged personal attack.[4] The notice and transcript gave defendant sufficient information concerning the facts and nature of its omission to meet the requirements of Section 503(b)(2).

commitment to such goals, considered as part of a measurable political continuum: *moving further to the left.* The American Heritage Dictionary 746 (New College Ed. 1976).

**3.** Many orders of the Commission are subject only to review under the Administrative Procedure Act. Section 402 of the Act provides for review by the Court of Appeals who must "determine the appeal upon the record before it in the manner prescribed by Section 10(e) [5 U.S.C. § 706]." If Congress intended such a standard of review for forfeiture orders, it could have included them within the scope of Section 402 rather than adding the trial de novo requirement to Section 504(a).

**4.** Both the complainant and the Commission had previously sent copies of that transcript to the defendant.

The notice focused upon certain excerpts from the broadcast:

" . . . and I think the gentlemen will have to admit that his HOMEFRONT magazine and his IAD are definitely subversive." "Now who can deny that HOMEFRONT is a publication of a subversive organization and certainly its head is an avowed Communist." The transcript, however, reveals that the Institute for American Democracy (IAD), a nationally known organization, was labeled "subversive" and "to the far left." Dr. Franklin H. Littell, the head of IAD was called "an avowed Communist." The transcript also contains statements describing how the Communist "cell" would eventually become the whole body and how Dr. Littell was "bent on infiltrating the Methodist Church in its entirety."

The purpose of the notice of apparent liability is to provide a licensee with notice of the charges against him. *See generally, Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935, 941 (5th Cir. 1971), *cert. denied*, 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 81 (1972); *L. G. Balfour Company v. F. T. C.*, 442 F.2d 1, 19 (7th Cir. 1971). The notice in this case fulfills that purpose.

The notice is adequate as long as "the one proceeded against be reasonably apprised of the issues in controversy, and any such notice is adequate in the absence of a showing that a party was misled." *Cella v. United States*, 208 F.2d 783, 789 (7th Cir. 1953), *cert. denied*, 347 U.S. 1016, 74 S.Ct. 864, 98 L.Ed. 1134 (1954); *accord Intercontinental Industries, Inc. v. American Stock Exchange, supra* at 941. In this case, there has been no showing that defendant was misled as to the issues in controversy between it and the Commission. The Notice of Apparent Liability complied with the statutory requirements of 47 U.S.C. § 503(b) and the constitutional requirement of reasonable notice embodied in the Fifth Amendment.

Defendant admits that it failed to notify IAD until May 20, 1971, twenty-seven days after the personal attack against it occurred. Consequently, plaintiff contends that on each day from May 1, 1971 until May 20, 1971, defendant failed to observe the three-pronged notice requirement of Rule 73.123(a). 47 U.S.C. § 503(b)(1)(E) provides in part that "Each day during which such violation occurs shall constitute a separate offense." Thus plaintiff claims that defendant, committing nineteen separate offenses, repeatedly violated the personal attack rule. *Cf. United States v. Daniels, supra* at 1081 (D.S.D.1976). Defendant, however, asserts that no repeated violations of the personal attack rule can arise from one personal attack made during one broadcast.

It is clear that the nature of the action or inaction proscribed by the regulation at issue determines whether a violation is repeated. Here, the proscribed conduct was:

(1) failing to notify IAD and Homefront of the date, time and identification of the broadcast during which the attack was made; (2) failing to provide a tape or summary of the broadcast of the attack; and (3) failing to offer IAD and Homefront reasonable opportunity to reply.

The personal attack rule is one component of the fairness doctrine, codified at 47 U.S.C. § 315. The purpose of both is to insure that the public is kept informed on controversial issues of public importance. The personal attack rule differs from the general fairness doctrine in requiring that the party attacked or a representative of the group attacked during the presentation of views on a controversial issue of public importance be given the opportunity to respond to the attack and to present to the public his or its views on that controversial issue of public importance. Obviously, the most effective means of informing and educating the public about divergent views on controversial issues of public importance is to present these views in close proximity to enable the public to contrast the second set of views with the first while the latter are still fresh in its mind. The longer the time elapsing between the broadcasts, the more difficult it becomes to correct erroneous statements and overcome faulty impressions.

In both *United States v. Daniels, supra*, and *Williams County Broadcasting Co. v. FCC*, Civil Action No. 75–1862 (D.D.C., November 2, 1976), *aff'd*, 186 U.S.App.D.C. 330, 569 F.2d 161 (1978), the violations for which the Commission had imposed forfeitures were repeated failures to observe Commission rules prohibiting certain conduct. In *Daniels*, the proscribed conduct consisted of defendant's beginning its station operation during pre-sunrise hours on fourteen consecutive days, while in *Williams* the proscribed conduct consisted of defendant's beginning its broadcasting one hour earlier than authorized on twenty-one consecutive mornings.

The distinction between this defendant and the defendants in *United States v. Daniels, Williams County Broadcasting Co. v.*

*FCC* and *United States v. Summa Corporation* is that defendant here violated the Commission's regulation by its continuing inaction rather than by continuing action. The language of 47 U.S.C. § 503(b)(1), however, makes no distinction between a repeated failure to observe the regulations which arises from a licensee's action and a repeated failure which arises through its inaction. Either course of conduct can incur forfeiture liability.

Acceptance of defendant's argument that at most only one continuing violation of the rule occurred would limit the Commission's ability to act to situations involving only the most flagrant disregard of a licensee's duties following a personal attack broadcast during the presentation of views concerning a controversial issue of public importance. The consequence of such a ruling would be at least the partial curtailment of the public's right to be fully informed about such issues.

In *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Supreme Court held that the personal attack rule did not constitute an unlawful restraint upon the broadcast licensee's first amendment rights of freedom of speech and of the press. *Id.* at 392, 89 S.Ct. 1794. At that time, the Court noted:

> Although broadcasting is clearly a medium affected by a First Amendment interest, [citation omitted], differences in the characteristics of news media justify differences in the First Amendment standards applied to them. *Id.* at 386, 89 S.Ct. at 1805.

> \* \* \* \* \* \*

> Where there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish. *Id.* at 388, 89 S.Ct. at 1806.

See also *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978), and *FCC v. Pacifica Foundation,* 435 U.S. 966, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978).

## FINDINGS OF FACT

1. The United States of America brings this action to recover a forfeiture of $1,000 imposed by the Federal Communications Commission upon defendant WIYN for repeated violations of the Commission's personal attack rule, 47 C.F.R. § 73.123(a).

2. Defendant is and, at all times relevant to this action, was the licensee of standard broadcast station WIYN, located in Rome, Georgia, within the meaning of Subsections 3(c) and 3(dd) of the Communications Act of 1934, 47 U.S.C. §§ 153(c) and 153(dd).

3. Defendant has its principal operating office in Rome, Georgia.

4. On April 23, 1971, during defendant's broadcast of the program *Comment,* the program commentator made the following statements concerning the Institute of American Democracy (IAD) and its newsletter, *HOMEFRONT*: [5]

> . . . That is precisely the theory behind the Communist strategy of infiltration. The Communist cell is eventually to become the whole body. The dominant force in the organizations institutions infiltrate. So there you have it. You have the organization, you have its head, and you have its paper. Now who can deny that *HOMEFRONT* is a publication of a subversive organization and certainly its head is an avowed Communist. And he is bent on infiltrating the Methodist Church in its entirety. And you can't get around the evidence. We read this article, incidentally, from *News and Views,* published in Wheaton, Illinois, and this particular edition was Volume 30, Number 1, date January 1967 and we could go on and on, but I believe we have proved our point and I think the gentleman will have to admit that his *HOMEFRONT* maga-

---

5. A copy of the complete transcript of the commentator's remarks on the subject is attached as Appendix A.

zine and his IAD are definitely subversive. They are to the Far Left and I don't know what more can be said on that. . . .

■ 5. These statements labeling IAD as a "subversive organization," its newsletter *HOMEFRONT* as "definitely subversive" and both as "to the Far Left" constituted an attack upon the honesty, character, integrity or like personal quality of both IAD and *HOMEFRONT*.

6. This personal attack occurred during a presentation of views on the Communist strategy of infiltration, and, particularly, of Communist infiltration of the Methodist Church.

7. The issue of Communist infiltration of the Methodist Church in the United States was a controversial issue in Rome, Georgia on the date of the broadcast.

8. The issue of Communist infiltration of the Methodist Church in the United States was an issue of public importance in Rome, Georgia, on the date of the broadcast.

9. Defendant never notified IAD or *HOMEFRONT* of the April 23, 1971 broadcast.

10. Defendant never sent IAD or *HOMEFRONT* a script, tape or summary of that broadcast.

11. On May 20, 1971, after the Executive Director of IAD had requested time to reply to the April 23 broadcast and the Commission had asked defendant to respond to a complaint lodged by IAD, WIYN offered IAD time to respond to the broadcast.

12. On July 28, 1971, the Commission issued a Notice of Apparent Liability for Forfeiture in the amount of $1,000.00 for defendant's apparent willful or repeated violation of Section 73.123(a) of the Commission's Rules and Regulations, 47 C.F.R. § 73.123(a).

13. Finding the defendant had repeatedly violated Section 73.123(a) of the Rules, the Commission ordered that defendant pay a $1,000.00 forfeiture in a decision issued on May 24, 1972. The Commission denied reconsideration of this order on May 28, 1975.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1345 and 47 U.S.C. § 504.

■ 2. Because 47 U.S.C. § 504 provides that this action for forfeiture recovery shall be trial de novo, this court is entitled to make an independent determination of whether defendant repeatedly violated the personal attack rule, 47 C.F.R. § 123(a). In reaching this determination, the court is not limited to a review of the administrative record of Commission proceedings from which this action arose.

3. Because 47 U.S.C. § 504 provides that this action for forfeiture recovery shall be a trial de novo, this Court may consider evidence relevant to each issue in controversy, even if that evidence never was before the Commission.

■ 4. Defendant repeatedly failed to observe the personal attack rule, Section 73.123(a) of the Commission's rules and regulations, 47 C.F.R. § 73.123(a), by its failure during each day between April 30, 1971, seven days after the broadcast, and May 20, 1971, to notify IAD or *HOMEFRONT* that they had been the subjects of an attack upon their honesty, character, integrity or like personal quality during the discussion of a controversial issue of public importance on the *Comment* program broadcast by defendant on April 23, 1971.

5. Defendant WIYN repeatedly failed to observe Section 73.123(a) of the Commission's rules and regulations, 47 C.F.R. § 73.123(a), by its failure during each day between April 30, 1971, seven days after the broadcast, and May 20, 1971, to provide IAD and *HOMEFRONT*, a script, tape or summary of the *Comment* program broadcast by defendant on April 23, 1971.

6. Defendant WIYN repeatedly failed to observe Section 73.123(a) of the Commission's rules and regulations, 47 C.F.R. § 73.123(a), by its failure during each day between April 30, 1971, seven days after the broadcast, and May 20, 1971 to offer IAD

and *HOMEFRONT* an opportunity to reply to the personal attack made on the *Comment* program broadcast by defendant on April 23, 1971.

7. The personal attack rule does not infringe a broadcast licensee's first amendment right to freedom of speech or freedom of the press.

8. Application of the personal attack rule to defendant WIYN does not violate the first amendment by unlawfully restraining or abridging either freedom of speech or freedom of the press.

9. The Notice of Apparent Liability issued by the Commission to defendant WIYN is statutorily valid and complies with the procedural due process requirements of the fifth amendment.

10. Imposition of a forfeiture upon defendant WIYN for repeated failure to observe the personal attack rule does not violate the due process clause of the fifth amendment.

Accordingly, it is ordered that a forfeiture be entered in favor of plaintiff and against defendant in the amount of $1000.00 and that judgment be so entered.

APPENDIX A

The following monologue was presented on the April 23, 1971 *Comment* Program on Radio Station WIYN in Rome, Georgia with The Reverend Bob Scruton as moderator.

. . . . the program, the activities, the organization that uses HOMEFRONT as their publication. On July 7, 1953, the late Benjamin Gittler testified before the House Committee on Un-American Activities concerning Dr. Littell's article. Mr. Gittler was a high ranking official of the Communist Party but defected from the Party and spent the balance of his life fighting Communism. He knew the Communist movements intimately, inside and out, and is well equipped to analyze Communist tactics and propaganda.

He said, "Mr. Littell's organizational proposals on the infiltration of religion follow closely the cell techniques on infiltration described in the thesis on organization of both the Communist Party and the Communist International. In his second article, "Protestantism is a Success," note success in quotation marks, his views put him in favor of planned economy and in the camp of the Communists who like to call themselves liberals. He continues, "to carry out aggressively and boldly a program to win support among church people for a system of planned economy and to build up opposition to the American economic system. Littell strongly advocates the cell concept of organization developed by the Communists as the most important element of the formation of the groups. Here are some of the salient points of his thesis: The center which brought the group together in the first place is the cell. The driving force in the Methodist Federation for Social Action is the small cell that knows where it is going. That is disciplined and the driving force in the organization. The record will show that the cell in the Federation consistently follows the Communist Party line. Mr. Littell describes the cell as follows, "The cell is a face to face group without turnover in membership." He elaborates, "This working unit in our time is usually called the cell. A term describing a living thing which divides (correction) which subdivides and becomes a whole body." That is precisely the theory behind the Communist strategy of infiltration. The Communist cell is eventually to eventually become the whole body. The dominant force in the organizations institutions infiltrate. So there you have it. You have the organization, you have its head, and you have its paper. Now who can deny that *HOMEFRONT* is a publication of a subversive organization and certainly its head is an avowed Communist. And he is bent on infiltrating the Methodist Church in its entirety. And you can't get around the evidence. We read this article, incidentally, from *News and Views*, published in Wheaton, Illinois, and this particular edition was Volume 30, Number 1, date January 1967 and we could go on and on, but I believe we have proved our point and I think the gentleman will have to admit that his *HOME-*

*FRONT* magazine and his IAD are definitely subversive. They are to the Far Left and I don't know what more can be said on that. We close the book on that subject.

This is your _____ program. We invite you to call 234–6277 and voice your opinion on the subject of your choice because this is your program.